# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Smeilis v. Lipkis, 2012 IL App (1st) 103385**

---

| | |
|---|---|
| Appellate Court Caption | KATHLEEN SMEILIS and WILLARD SMEILIS, Plaintiffs-Appellants, v. EVAN LIPKIS and EVAN LIPKIS, M.D., S.C., Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3385 |
| Filed | March 23, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the neurological injuries plaintiff suffered as a result of the alleged delay in the surgical treatment of her *cauda equina* syndrome, the trial court properly applied judicial estoppel in dismissing plaintiff's refiled complaint against the physician who treated her while she was at a nursing home, since plaintiff's original complaint against the hospital and physicians who initially cared for her there and the nursing home and the physician named in the refiled complaint was dismissed pursuant to settlements with all defendants, except the physician named in the refiled complaint, and the refiled complaint alleged the underpinning of a theory of liability that was at odds with the factual underpinning of the theory of liability asserted in the original complaint. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-011345; the Hon. Irwin Solganick, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

William F. Martin and Philip Davidson, both of Hilfman & Martin, P.C., of Chicago, for appellants.

James K. Horstman and Melissa H. Dakich, both of Cray Huber Horstman Heil & VanAusdal LLC, of Chicago, for appellees.

Panel

JUSTICE GARCIA delivered the judgment of the court, with opinion.
Justice Lampkin concurred in the judgment and opinion.
Presiding Justice R. Gordon dissented, with opinion.

**OPINION**

¶ 1    The circuit court applied judicial estoppel to the plaintiffs' claims in a refiled medical negligence complaint and dismissed the complaint with prejudice. In the original complaint filed in 2001, the plaintiffs, Kathleen Smeilis and Willis Smeilis, wife and husband, alleged that Kathleen developed a progressive neurological condition while she was a patient at Glenbrook Hospital, which the hospital doctors failed to timely diagnose and treat. According to the plaintiffs' proximate cause expert, Kathleen needed to undergo corrective surgery by August 10, 1999, to avoid permanent injury. On August 12, 1999, Kathleen was released from the hospital and transferred to a nursing home. At the nursing home, Kathleen was under the care of Dr. Evan Lipkis. The plaintiffs settled with the hospital for $3 million and the nursing home for $200,000, leaving only Dr. Lipkis and his corporate entity as defendants. On the eve of trial in 2007, the plaintiffs voluntarily dismissed the complaint against the defendants. The plaintiffs refiled the complaint within 30 days. The plaintiffs' new proximate cause expert witness opined that Kathleen suffered the permanent neurological damage between August 14 and 18, 1999, while she was a patient at the nursing home and under the care of Dr. Lipkis. The new medical expert opined that the hospital defendants that settled with the plaintiffs were not negligent in their care of Kathleen and that fault laid with Dr. Lipkis. The circuit court ruled judicial estoppel barred the 2007 claims and dismissed the refiled complaint. We affirm.

¶ 2                      BACKGROUND

¶ 3    Kathleen Smeilis sustained permanent injuries in August 1999 as a result of a medical condition called *cauda equina* syndrome (CES). CES is a condition in which a group of nerves that extend out of the lower spine become compressed when something, such as a herniated disk, places pressure on them. It can result in neurological damage, including decreased motor function, loss of bladder and bowel control, and pain or numbness in the lower extremities. When a patient develops CES, doctors consider it an emergency. A delay in performing corrective surgery results in permanent neurological damage.

¶ 4		On August 7, 1999, Kathleen arrived at the emergency room at Glenbrook Hospital (Glenbrook) complaining of extreme pain in her lower back. Kathleen brought with her an MRI film of her back taken on July 19, 1999, which revealed that she had spinal stenosis secondary to a broad-based disc protrusion and nerve root compression. Following admission, Kathleen was placed under the care of several doctors specializing in internal medicine, including attending physicians and resident doctors.

¶ 5		On August 9, a Glenbrook doctor administered an epidural injection to relieve Kathleen's lower back pain. Following the injection, her symptoms got worse. Kathleen complained of persistent pain and numbness in her lower back and lower extremities. At one point, when she attempted to get out of bed, her pain was so severe that she could not stand; she required assistance to use the bathroom.

¶ 6		On August 12, a Glenbrook doctor determined that Kathleen's function in the lower extremities was appropriate and observed no evidence of problems with her bowel or bladder. Based on these findings, Glenbrook discharged Kathleen to Abington Nursing Home (Abington) for rehabilitative treatment. At Abington, Kathleen was placed under the care of Dr. Lipkis. The nursing home records reveal that Dr. Lipkis did not examine Kathleen until August 14, two days after her admission.

¶ 7		During the night of August 12 at Abington, a nurse discovered that Kathleen was having difficulty urinating. The nurse notified Dr. Lipkis, who ordered a catheter or Lasix to provide relief. The next morning on August 13, Kathleen complained of severe calf pain. Upon being informed, Dr. Lipkis opined that the problem was sciatica, which we understand to generally refer to lower back and leg pain caused by compression of the sciatic nerve. On August 14, Dr. Lipkis examined Kathleen for the first time. His examination notes provide limited documentation; nonetheless, Dr. Lipkis testified at his deposition that his evaluation found Kathleen not to display any neurological abnormality.

¶ 8		On August 15, Kathleen complained of constipation. This continued into the following day when Kathleen again complained of urination problems. Dr. Lipkis ordered that Kathleen receive a catheter. Kathleen continued to complain of constipation and urination problems. Dr. Lipkis evaluated her again on August 18. At this time, Dr. Lipkis concluded that Kathleen had signs of spinal cord compression, including lack of sphincter control. He made a notation of this loss of control in the medical record, with a notation that Kathleen had sphincter control on August 14.

¶ 9		On August 18, Dr. Lipkis transferred Kathleen back to Glenbrook. From there, she was transferred to Evanston Hospital, where she underwent immediate surgery to correct the CES. The surgery corrected the problem but, due to the delay in diagnosis, Kathleen suffered permanent neurological damage. As a consequence, she has weakness in her lower extremities and uses a walker; she also has decreased bladder and bowel function; she suffered a loss of sexual function and has problems with reflexes and motor strength.

¶ 10		In 2001, the plaintiffs filed their negligence suit against Glenbrook, the treating doctors at Glenbrook, Abington, Dr. Lipkis, and the corresponding corporate entities of the defendants. The 2001 complaint alleged that Kathleen's injuries were proximately caused by the defendants' delay in diagnosing her CES. The parties engaged in discovery.

¶ 11 The plaintiffs retained as one of their experts Dr. Gary Skaletsky, a neurosurgeon, who testified in his deposition that CES patients require immediate surgery to avoid permanent damage. Following the development of CES, there is a small window of time for surgery to be performed for a CES patient to regain full neurological function. Dr. Skaletsky opined that on August 10, Kathleen was "an urgent surgical candidate." Dr. Skaletsky testified that had surgery been performed on August 10, Kathleen would likely have "significantly more" neurological function. He specifically testified that had the surgery been performed on or after August 11, when Kathleen first experienced an inability to stand, her condition would likely not be any better than her present condition. We set out Dr. Skaletsky's pertinent deposition testimony.

"If she had surgery on the 10th, I believe that she would be significantly more functional neurologically. More likely than not she would have some weakness of her flexors and extensors of the feet. She might have some numbness of the lower extremities.

Had the surgery waited until the 11th when it was indicated she could not stand next to the bedside to go to the bathroom, I think it is likely that her neurological condition would not be much changed from what it is today."

¶ 12 Following the conclusion of discovery, all the defendants, except Dr. Lipkis and his corporate entity, settled with the plaintiffs. The plaintiffs received $3 million from Glenbrook and $200,000 from Abington. The plaintiffs voluntarily dismissed the remainder of their complaint against Dr. Lipkis on September 27, 2007.

¶ 13 On October 17, 2007, the plaintiffs filed a new complaint against Dr. Lipkis and his corporation. The 2007 complaint alleged that Dr. Lipkis was the proximate cause of Kathleen's injuries. The plaintiffs gave notice of a new expert witness, Dr. Andrew Chenelle, a neurologist. The plaintiffs retained the same experts on internal medicine that were deposed in the 2001 action. The defendants filed notice of their intent to call Dr. Skaletsky, the plaintiffs' neurological expert from the 2001 action.

¶ 14 At his discovery deposition, Dr. Chenelle disagreed with many of the opinions that Dr. Skaletsky gave during his deposition. Dr. Chenelle testified that surgery on August 14, 1999, or even several days later, would have left Kathleen in a better condition than her current state. Dr. Chenelle did not "fault" the doctors at Glenbrook for discharging Kathleen when they did or for failing to perform emergency CES surgery on Kathleen before her transfer to Abington. Dr. Chenelle opined that the Glenbrook defendants did not deviate from the standard of care in their treatment of Kathleen. Dr. Chenelle grounded his opinion on Dr. Lipkis's initial examination on August 14, in which he determined that Kathleen had no neurological abnormality; Dr. Chenelle "assumed" this conclusion was accurate. He testified that he worked off this assumption but never stated whether he agreed with Dr. Lipkis's conclusion.

¶ 15 During pretrial proceedings, the circuit court denied the plaintiffs' motion to strike the defendants' affirmative defense of judicial estoppel. Instead, the court converted the defendants' affirmative defense motion into a motion to dismiss the complaint, which it then set for a hearing. Upon consideration of the arguments, the circuit court concluded that the plaintiffs' claims in their 2007 complaint were barred by judicial estoppel and dismissed the

complaint with prejudice pursuant to section 2-619(a)(9) of the Illinois Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)). The plaintiffs appeal.

¶ 16                                                    ANALYSIS

¶ 17       The plaintiffs make three challenges to the circuit court's ruling that judicial estoppel barred the plaintiffs' complaint: (1) expert opinions cannot be barred by judicial estoppel; (2) the plaintiffs made no assertions during the 2001 proceeding when no trial ensued to bind them in the 2007 proceeding; and (3) no showing was made that the settlements in the 2001 suit came about because of Dr. Skaletsky's opinion testimony to establish the plaintiffs "benefitted" from an earlier inconsistent position for the purpose of applying judicial estoppel.

¶ 18       The defendants respond that it is undeniable that the plaintiffs' 2001 and 2007 complaints alleged two wholly inconsistent theories of liability. In the 2001 complaint, the plaintiffs alleged the CES developed at Glenbrook Hospital, in accord with Dr. Skaletsky's deposition testimony regarding the necessity of surgery before August 11, 1999, to have avoided Kathleen's extant neurological injuries. In the 2007 complaint, Dr. Chenelle, the plaintiffs' new expert witness, contended that Kathleen did not develop CES until after she was transferred to the nursing home and placed under the care of the defendants on August 12. The defendants assert the circuit court correctly applied judicial estoppel to bar the plaintiffs' claims under the new factual underpinning of the 2007 complaint, grounded on Dr. Chenelle's expert opinion, which was wholly at odds with the factual underpinning of the theory asserted in the 2001 complaint, grounded on Dr. Skaletsky's expert opinion.

¶ 19       The doctrine of judicial estoppel applies in a judicial proceeding when litigants take a position, benefit from that position, and then seek to take a contrary position in a later proceeding. *Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi*, 342 Ill. App. 3d 453, 460 (2003). "The principle is that if you prevail in Suit #1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547 (7th Cir. 1990). The purpose of judicial estoppel is to promote truth-seeking in the courts, rather than gamesmanship; its aim is to protect the integrity of the judicial system, not necessarily the litigants. *Barack Ferrazzano*, 342 Ill. App. 3d at 460. "[J]udicial estoppel is flexible and not reducible to a formula." *Bidani v. Lewis*, 285 Ill. App. 3d 545, 550 (1996).

¶ 20       Generally, five requirements must be shown to apply judicial estoppel. The party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial proceedings, (4) with the intent that the trier of fact accept the facts alleged as true, and (5) have succeeded in the first proceeding and received some benefit from it. *Barack Ferrazzano*, 342 Ill. App. 3d at 460. A party seeking to establish judicial estoppel must prove each requirement by clear and convincing evidence. *Boelkes v. Harlem Consolidated School District No. 122*, 363 Ill. App. 3d 551, 554 (2006) (citing *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 314 (2001) (requiring "clear and unequivocal" evidence of judicial estoppel)).

¶ 21                              Standard of Review

¶ 22       Generally, motions to dismiss are subject to a *de novo* standard of review. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). A circuit court's decision to apply the doctrine of judicial estoppel typically falls within the sound discretion of the circuit court. *Barack Ferrazzano*, 342 Ill. App. 3d at 459. In *Barack Ferrazzano*, this court applied an abuse of discretion standard to the application of judicial estoppel, while we applied *de novo* review to the grant of summary judgment. *Id.*

¶ 23       In the instant case, we elect to apply the same standard of *de novo* review to the grant of the motion to dismiss and to the application of judicial estoppel because the two issues are inseparable. If judicial estoppel was correctly applied, the granting of the motion to dismiss would necessarily follow. The inverse is equally true. We note that the circuit court judge who dismissed the plaintiffs' 2007 complaint was not the circuit court judge who presided over the 2001 litigation. The record reveals the judge's decision to apply judicial estoppel rested solely on his comparison of matters spread of record in the 2007 proceeding and matters spread of record in the 2001 proceeding. "When a trial judge bases his decision solely on the same 'cold' record that is before the court of review, it is difficult to see why any deference should be afforded to that decision." *Toland v. Davis*, 295 Ill. App. 3d 652, 654 (1998). It appears the circuit court judge concluded that as a matter of law judicial estoppel applied. See *Redmond v. Socha*, 216 Ill. 2d 622, 634 (2005) (only when the trial court actually engages in an exercise of discretion should the abuse of discretion standard apply). Also, the *de novo* standard of review, which applies to the grant of a motion to dismiss, enables us to give full consideration to the plaintiffs' arguments regarding the application of judicial estoppel.


¶ 24                              Opinion Testimony

¶ 25       The plaintiffs first argue that "opinion testimony in general, and medical opinion testimony in particular, are not subject to the application of the doctrine of judicial estoppel." The plaintiffs urge that judicial estoppel applies only to facts and hence cannot apply to the opinion testimony of an expert. In a related contention, the plaintiffs assert that judicial estoppel is limited to assertions of a "party," which would render judicial estoppel inapplicable to the testimony of an expert witness. We address the arguments together.

¶ 26       The plaintiffs are correct that authority exists that casts doubt on the application of judicial estoppel to opinion testimony. See *Ceres Terminals, Inc. v. Chicago City Bank & Trust Co.*, 259 Ill. App. 3d 836 (1994); *Department of Transportation v. Grawe*, 113 Ill. App. 3d 336 (1983). As we explain below, we find the instant case distinguishable from those cases. The salient difference in this case is reflected in the trial court proceedings. The plaintiffs could have elected to pursue the case against the defendants under their discovery disclosures in the 2001 complaint, yet elected not to.[1] The crux of the plaintiffs' 2007 case

---

[1]The reason the plaintiffs elected not to litigate their claims against the instant defendants under the 2001 complaint seems clear. Under the 2001 theory of liability, Kathleen developed CES while a patient at Glenbrook. Under this theory, the plaintiffs would recover against the defendants

rested on the opinion of Dr. Chenelle, which placed principal, if not exclusive, blame on Dr. Lipkis.

¶ 27    In the 2001 complaint, the plaintiffs relied on the opinion espoused by Dr. Skaletsky to place principal responsibility on the Glenbrook doctors. According to Dr. Skaletsky's opinion, by August 12, when Kathleen was transferred to Abington and placed under the care of Dr. Lipkis, Kathleen had suffered the permanent and irreversible injuries for which she received compensation in the settlements with Glenbrook and Abington.

¶ 28    The 2007 complaint, by necessity, alleged that only Dr. Lipkis was the proximate cause of Kathleen's injuries. To proceed against Dr. Lipkis, as the only remaining physician, the plaintiffs necessarily rejected the position espoused by Dr. Skaletsky's expert testimony that Kathleen suffered her permanent injuries on or before August 10, 1999, in favor of the position now espoused by Dr. Chenelle that Kathleen's permanent injuries did not occur until on or after August 14, 1999, when she was under Dr. Lipkis's care.

¶ 29    The undeniable circumstance of the plaintiffs' offering conflicting medical opinions upon which they separately grounded different liability theories drives our decision not to follow the strict requirements for the application of judicial estoppel doctrine advanced by the cases, *Ceres Terminals* and *Grawe*, cited by the plaintiffs. Neither our research nor apparently that of the parties has disclosed the application of judicial estoppel in the context of a medical negligence case, making this a case of first impression. It may well be that medical negligence cases compel greater flexibility in the doctrine of judicial estoppel than has been recognized to date in other contexts. We discuss both *Ceres Terminals* and *Grawe* to explain where the analysis in this case diverges on the application of judicial estoppel to opinion testimony of a nonparty witness.

¶ 30    In *Ceres Terminals*, the landlord and business tenant disputed the fair market rental value of property used to determine the lease rate in a commercial lease. *Ceres Terminals*, 259 Ill. App. 3d at 844. At trial, the landlord presented the testimony of professional appraisers to establish the valuation of the property. *Id.* at 844-45. The circuit court rejected the business tenant's contention that judicial estoppel barred the appraiser's testimony based on the landlord's submission of a lower valuation amount in an earlier property tax assessment proceeding. *Id.* at 849. This court rejected the same contention by the business tenant on appeal. *Id.* at 851-52. In explaining our decision, we concluded that judicial estoppel did not apply to the sort of valuation opinion at issue in *Ceres Terminals*. *Id.* The appraiser's "representation was an *opinion* on the market value of the property, not a representation of a fact." (Emphasis in original.) *Id.* at 851. "The estimation of a property's fair market valuation is by its very nature an opinion, not a representation of fact." *Id.* at 852. We noted that "representations on matters of opinion are insufficient to support the invocation of the doctrine of judicial estoppel." *Id.* at 851-52.

¶ 31    The opinion testimony at issue in this case is of a different type than the opinion

only if they damaged the plaintiffs beyond the $3,200,000 the codefendants paid in settlements. See *Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 12 (trial court reduced plaintiff's $250,000 jury award to zero in light of a greater settlement with a codefendant).

testimony involved in *Ceres Terminals*. This case involves an action for medical negligence. "The central issue in a medical-malpractice action is the standard of care against which a doctor's negligence is judged." *Curi v. Murphy*, 366 Ill. App. 3d 1188, 1199 (2006). A deviation from the standard of care constitutes professional negligence, which must be *proved by expert testimony*. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423 (1975). In fact, absent an expert witness qualified to give standard of care testimony, the malpractice suit is subject to dismissal. See *McWilliams v. Dettore*, 387 Ill. App. 3d 833, 841 (2009) (where plaintiffs' medical expert was not qualified to testify against defendant doctor, the circuit court properly granted motion to dismiss).

¶ 32    In *Ceres Terminals*, the property valuation opinion testimony was offered to prove a factual dispute in the context of a declaratory judgment to declare the commercial lease expired. *Ceres Terminals*, 259 Ill. App. 3d at 839. Here, the 2007 expert opinion was offered not merely to resolve a factual dispute between the parties; Dr. Chenelle's opinion testimony provided an essential element of the plaintiffs' cause of action alleging medical negligence, a distinction we conclude takes this medical negligence case out of the holding in *Ceres Terminals* regarding the application of judicial estoppel to opinion testimony.

¶ 33    In the instant case, the plaintiffs sought to replace the opinion of their original 2001 medical expert with the opinion of the medical expert they retained in 2007. The plaintiffs adopted a wholly new view of the facts in order to recover against the sole remaining physician. Had the plaintiffs taken the position they take now against Dr. Lipkis, that he is solely at fault for Kathleen's current condition, in their 2001 complaint, it is reasonable to conclude that they would not have received the $3 million settlement from Glenbrook Hospital. Nor can there be any doubt that Dr. Chenelle's expert opinion was offered to convince the eventual trier of fact that Dr. Lipkis should be found wholly responsible for Kathleen's current neurological state. This was the only purpose and intended effect of Dr. Chenelle's exert opinion. See *Barack Ferrazzano*, 342 Ill. App. 3d at 462 ("Defendants' submission of plaintiff's detailed legal and expense billing could have had only the purpose and intended effect of persuading the *** arbitration panel to accept plaintiff's affidavit as true and, based upon the truth and accuracy of its submission, that the arbitration panel would grant the remedy requested."). This is precisely the sort of manipulation of the court system that judicial estoppel is designed to prevent. *Bidani*, 285 Ill. App. 3d at 550 (judicial estoppel is "designed to promote the truth and to protect the integrity of the court system"). The circuit court judge concluded as much: "I did not find this a difficult issue to resolve in my own mind."

¶ 34    In this medical negligence case, where proof of causation rests on the opinion of an expert, the instant plaintiffs may not shield themselves, for purposes of the application of judicial estoppel, from the irrefutable finding that two factually inconsistent positions were taken in the 2001 and 2007 complaints based on the contention that the inconsistent positions were those of their experts, not of the plaintiffs personally. We find no basis to disagree with the circuit court that judicial estoppel applied in the instant case to protect the courts. See *Ceres Terminals*, 259 Ill. App. 3d at 850. Thus, unlike *Ceres Terminals*, we are unpersuaded that judicial estoppel is rendered inapplicable merely because the inconsistent positions clearly taken by the plaintiffs were espoused by medical expert witnesses rather than directly

by the plaintiffs. The plaintiffs are not rendered immune from judicial estoppel merely because they retained a new medical expert witness who took a view of their case at odds with the view the plaintiffs espoused through their prior expert, Dr. Skaletsky, in the 2001 litigation that ended in substantial settlements.

¶ 35     Nor is the circuit court's decision in this case at odds with the holding in *Grawe*. In *Grawe*, a worker employed by the Department of Transportation suffered a heart attack; he filed a claim with the Illinois Industrial Commission seeking workers' compensation benefits. *Grawe*, 113 Ill. App. 3d at 338. At a hearing before an arbitrator, the worker submitted into evidence statements by his doctors that he was " 'totally disabled *at the present time*.' " (Emphasis in original.) *Id.* at 342. The arbitrator awarded benefits, finding that the worker was disabled and "wholly and permanently" incapable of working. *Id.* Over a year after the hearing, the worker underwent bypass surgery. *Id.* at 338. His physician sent a letter to the Department of Transportation stating that the worker was fit to return to his job. *Id.* The worker applied to "be reinstated to his position as a highway maintainer with the Department," which the Civil Service Commission granted. *Id.* In its appeal, the Department argued that the worker was estopped from asserting that he was able to perform his duties because he had already collected benefits on the basis of being "permanently disabled." *Id.* at 341.

¶ 36     The *Grawe* court rejected the urging of the Department to apply judicial estoppel regarding the worker's claim that he was now physically able to do his prior work. *Id*. at 343. The court distinguished a similar case, *Department of Transportation v. Coe*, 112 Ill. App. 3d 506 (1983), where the court upheld the application of judicial estoppel. *Grawe*, 113 Ill. App. 3d at 342. In *Grawe*, the worker himself never claimed before the Industrial Commission to be permanently disabled. *Id.* at 342-43. The majority rejected the Department's contention that statements from the worker's doctor should be binding on the worker. The court noted that the statements of the doctor were qualified: " '[T]he patient is totally disabled *at the present time* and the length of his disability is undeterminable *at this time*.' " (Emphases in original.) *Id.* at 342. Neither statement constituted "an explicit statement that Grawe is permanently disabled." *Id.* The majority's examination of the record also compelled its conclusion that the settlement agreement adopted by the Industrial Commission, which superceded the arbitrator's finding of permanent disability, did not contain a "position" by Grawe that was inconsistent with the position he took before the Civil Service Commission in light of the Department's estoppel claim. *Id.* at 342-43. "The gravamen of the Department's equitable estoppel argument is that Grawe should have notified the Department of his coronary bypass operation prior to settling his claim against the Department, and that by failing to do so, Grawe misled the Department into believing that he was permanently incapacitated from performing his duties as a highway maintainer at the time of the settlement." *Id*. at 343. The court rejected the Department's logic and concluded judicial estoppel did not apply. *Id*. Notably, it appears the majority declined to bind Grawe to the statements of his doctors because the statements were opinions; the dissent, however, would have applied "judicial estoppel" to bar Grawe's claim for reinstatement. *Id.* at 345 (Trapp, J., dissenting).

¶ 37     We find no reason to disagree with the decision in *Grawe*. Unlike in *Grawe*, where the

-9-

worker's health improved following bypass surgery, there has been no change in the circumstances from 2001 to 2007 in the instant case. Rather, the change occurred only in the plaintiffs' theory of liability. We conclude that neither *Grawe* nor *Ceres Terminals* is at odds with the circuit court's application of judicial estoppel in this case.

¶ 38 The plaintiffs have alleged that Dr. Lipkis was the proximate cause of Kathleen's injuries, and they sought to establish that fact the only way they could–through Dr. Chenelle's expert opinion. While clearly a proffered opinion, it is an opinion on behalf of the plaintiffs that the plaintiffs wish to have ultimately accepted by the trier of fact, much as the plaintiffs would have asked the jury to accept Dr. Skaletsky's opinion had the 2001 complaint gone to trial. We do not hesitate to conclude that Dr. Chenelle's opinion was, from the plaintiffs' perspective, a "representation of fact" of the proximate cause of Kathleen's neurological damage. *Cf. Ceres Terminals*, 259 Ill. App. 3d at 851-52.

¶ 39 It is also clear that had a trial ensued based on the 2007 complaint, the jury would have been presented with opinions from Dr. Chenelle and Dr. Skaletsky, on opposite sides of the proximate cause issue, each of whom had at some point offered support to the claims of the plaintiffs. It is likely the jury would have been informed or at least been able to infer that the plaintiffs first placed principal liability on Glenbrook based on the expert opinion of Dr. Skaletsky; relying now on the expert opinion of Dr. Chenelle, the plaintiffs would seek to place principal liability on Dr. Lipkis. It is fair to say that the contrary claims would be seen by the jury as a cynical manipulation of the court system in an effort to benefit the plaintiffs under a theory different from the one that resulted in settlements of $3,200,000. The purpose of judicial estoppel is "to promote the truth and to protect the integrity of the court system by preventing litigants from deliberating shifting positions to suit the exigencies of the moment." (Internal quotation marks omitted.) *Barack Ferrazzano*, 342 Ill. App. 3d at 460. We agree with the circuit court that, as a matter of law, protecting the integrity of the court system compelled the application of judicial estoppel to the plaintiffs' claims in their 2007 complaint.

¶ 40 The opinion testimony at issue in this case is precisely the sort that stands for a representation of fact, as plainly urged by the plaintiffs in this medical malpractice case; the medical opinion testimony is substantially different from the fair market valuation of property at issue in *Ceres Terminals* to take this case out of its cautionary language that "representations on matters of opinion are insufficient to support the invocation of the doctrine of judicial estoppel." *Ceres Terminals*, 259 Ill. App. 3d at 851-52.

¶ 41 We reject the plaintiffs' overarching contention that either separately or in combination, the three arguments urged persuade against the application of judicial estoppel in the context of this medical malpractice case.

¶ 42                                         Binding Assertions
¶ 43 The plaintiffs maintain that judicial estoppel is precluded where the 2001 proceeding ended with the settlements because "[n]o evidence or testimony was presented to the court regarding the parties' settlements" to permit a court to determine the binding assertions underlying the settlements. To support this claim, the plaintiffs observe that the "opinions

in this case were made in different depositions in the different actions." The plaintiffs also argue that the opinions of Dr. Skatelsky and Dr. Chenelle are not totally inconsistent and thus cannot support the application of judicial estoppel. According to the plaintiffs, the expert opinions "include[d] elements of agreement and disagreement. For instance, both experts testified that *cauda equina* syndrome presents a neurological emergency, that the sooner the surgery the better the outcome for the patient, and that Kathleen's bowel and bladder deficits occurred in or became progressively worse at the Abington."

¶ 44    In the 2001 litigation, Dr. Skaletsky stated that Kathleen had to undergo emergency surgery on or before August 10, 1999, to have "significantly more" neurological function than she has now. He stated that by August 14, it was too late for surgery to make any difference in Kathleen's condition. In direct contradiction to the opinion offered by the plaintiffs through Dr. Skaletsky, the plaintiffs now offer Dr. Chenelle's testimony that Kathleen had not yet displayed neurological symptoms on August 14 and therefore she was a candidate for emergency CES surgery for a few days after that date. To deflect the claim that they have changed their position, the plaintiffs assert Dr. Chenelle's testimony is based on the reasonable assumption that Dr. Lipkis was correct when he claimed that Kathleen's August 14 examination revealed no neurological abnormalities, which Dr. Lipkis testified to during his deposition in the 2001 litigation.

¶ 45    The concern addressed by the doctrine of judicial estoppel is the taking of inconsistent positions, not with which position is truthful. *Bidani*, 285 Ill. App. 3d at 550 ("judicial estoppel precludes a contradictory position without examining the truth of either statement"). Dr. Lipkis's testimony did not change from the 2001 complaint to the 2007 complaint. It is the plaintiffs' position that has changed. Under their 2001 liability theory premised on Dr. Skaletsky's opinion, the plaintiffs necessarily claimed that the examination on August 12 by the Glenbrook defendants, showing Kathleen's function in the lower extremities was appropriate, was inaccurate. In so contending, the plaintiffs necessarily took the position that Dr. Lipkis's examination on August 14, showing no neurological abnormalities, was equally inaccurate. The plaintiffs now necessarily take the position that both examinations were accurate to support their contention that the CES developed after August 14, while Kathleen was under the care of Dr. Lipkis.

¶ 46    Judicial estoppel is a common law doctrine. It is flexible and not reducible to a pat formula. *Biandi*, 285 Ill. App. 3d at 550. Not every requirement of the doctrine noted in prior decisions will necessarily apply under the circumstances of a particular case. See *Barack Ferrazzano*, 342 Ill. App. 3d at 465 n.8 (technical requirement of an oath discarded when its requirement is illogical). This is especially true when strict application of a requirement would frustrate the public policy underlying the application of the doctrine.

¶ 47    The plaintiffs' facile claim that Dr. Chenelle's opinion was contrary to Dr. Skaletsky's opinion merely because Dr. Chenelle "assumed" the accuracy of the August 14 examination by Dr. Lipkis does not entitle the plaintiffs to a second bite at the negligence apple. In our judgment, it matters not that the plaintiffs can point to Dr. Lipkis's August 14 examination to support their new theory of liability. Our decision is driven by the inconsistent positions undeniably taken by the plaintiffs in the 2001 litigation and 2007 litigation. In the 2001 litigation, the plaintiffs necessarily asserted that the August 12 examination by Glenbrook

(and implicitly the August 14 examination by Dr. Lipkis) was negligently performed given Dr. Skaletsky's opinion that Kathleen was "an urgent surgical candidate" on August 10. In the 2007 litigation, the plaintiffs now assert that the August 14 examination by Dr. Lipkis was competently performed.

¶ 48    Thus, given the conflicting expert opinions offered by the plaintiffs, this case is indistinguishable from the situation of an adept litigant arguing one proposition in the original suit and then seeking to persuade a trier of fact that a contrary proposition should be taken as true in a later suit. The plaintiffs may not urge that CES occurred no later than August 10, in the 2001 lawsuit, benefit under that proposition, only to then urge that CES occurred on or after August 14, in order to receive a benefit under the 2007 complaint against the only remaining physician. The plaintiffs may not shield themselves from judicial estoppel merely because the assertions, plainly made by the experts on the plaintiffs' behalf, never arose during the course of a trial.

¶ 49    We reject the plaintiffs' argument that no binding assertions were made in the 2001 litigation to preclude the application of judicial estoppel regarding the plaintiffs' claims in their 2007 complaint.

¶ 50                                               Benefit

¶ 51    Lastly, the plaintiffs argue that before the circuit court could find that they received a "benefit" from the 2001 litigation, there must be a showing that the settlements came about from Dr. Skaletsky's proximate cause opinion. The plaintiffs contend judicial estoppel is inapplicable where no "evidence" was introduced as to the foundation for the settlements. "[The plaintiffs] dispute that any particular fact, opinion, testimony, or proposition was the basis of their settlement with the hospital defendants. There is absolutely no evidence of any reason or reasons the parties settled. *** As such, the defendants have failed to prove by clear and convincing evidence that the plaintiffs received any particular benefits from Dr. Skaletsky's opinions."

¶ 52    As we concluded above, the plaintiffs took two factually inconsistent positions in the 2001 litigation and the 2007 litigation with the intent that the respective trier of fact would accept the plaintiffs' position before it as true. The plaintiffs now contend there must exist "evidence" that the settlements the plaintiffs received came about through Dr. Skaletsky's opinion they offered in the 2001 litigation before their claims in the 2007 litigation can be barred by judicial estoppel. According to the plaintiffs, without such evidence, no showing can be made that they "benefitted" under the doctrine of judicial estoppel. We disagree.

¶ 53    The court's concern under the doctrine of judicial estoppel is with inconsistent positions taken by the plaintiffs, not with the truthfulness of either position. *Bidani*, 285 Ill. App. 3d at 550 ("judicial estoppel precludes a contradictory position without examining the truth of either statement"). Not surprisingly, the plaintiffs do not cite a single case that holds that an evidentiary link must be proved between the undeniable benefit the plaintiffs received and the acknowledged inconsistent opinion given by Dr. Skaletsky in the 2001 litigation. To quote *Bidani*, the plaintiffs are "overstating the requirement." *Bidani*, 285 Ill. App. 3d at 552.

¶ 54    In *Bidani*, judicial estoppel was applied even in the absence of a concrete benefit to the

party that was estopped. In that case, the circuit court entered summary judgment to the defendants when it was proved that Dr. Bidani had "testified that he had no interest in businesses in a prior lawsuit and now claims in this suit that he does have an interest in the same businesses." *Id.* at 547. The prior lawsuit concerned proceedings in his dissolution of marriage in which he denied having ownership in any undisclosed businesses. Dr. Bidani did not disclose ownership in the businesses during the dissolution proceedings that were the subject of the litigation from which he appealed. Against the argument "that he did not receive any benefit from his position in the divorce proceeding" (*id.* at 552), we upheld the application of judicial estoppel based on the "trial court [having] approved the settlement agreement and entered final judgment without including Dr. Bidani's alleged interests in those companies" (*id.* at 553). We quoted approvingly from a federal case: " 'Sometimes a settlement sidesteps the issue in the first case, so that neither side prevails on a particular contested issue. *** Persons who triumph by inducing their opponents to surrender have "prevailed" as surely as the persons who induce the judge to grant summary judgment.' " *Id.* (quoting *Kale v. Obuchowski*, 985 F.2d 360, 362 (7th Cir. 1993).

¶ 55    We need say nothing more than the plaintiffs as a matter of common sense and law benefitted from their claims in the 2001 litigation.

¶ 56    The plaintiffs also argue that no determination can be made that they intended the trier of fact to accept as true any assertions made in the 2001 case because no evidence was ever presented to the trier of fact. In essence, this argument is a revival of the claim that no binding assertions were made because the case did not go to trial. A rejected argument cast anew is no more persuasive. We add to our conclusions *supra* that the plaintiffs filed notice with the circuit court that they intended to use Dr. Skaletsky as an expert witness on proximate cause in the 2001 litigation. They presented him at the deposition to give his opinions under oath. If, as the plaintiffs now intimate, they may not have intended for the trier of fact to accept Dr. Skaletsky's assertions as true, it is difficult to comprehend why they retained him as an expert witness.

¶ 57    In the absence of authority that stands for the proposition the plaintiffs urge before us regarding the clear benefit they received, we remain persuaded that all the requirements under the doctrine of judicial estoppel were established in this case. To be clear, we have no doubt that without Dr. Skaletsky's opinion that Kathleen had to undergo emergency surgery on or before August 10, 1999, to have "significantly more" neurological function than she has now, the plaintiffs would not have received settlements of $3,200,000. See *McNamara v. City of Chicago*, 138 F.3d 1219, 1225 (7th Cir. 1998) ("The doctrine of judicial estoppel requires *** that the party sought to be estopped have obtained a favorable judgment or *settlement ****." (Emphasis added.)).

¶ 58    We strongly reject the bald contention that a showing must be made of the "reasons the parties settled" before the plaintiffs can be found to have received a benefit from the inconsistent positions taken in the 2001 and 2007 lawsuits to trigger judicial estoppel.

¶ 59                    Defendants' Claim of *Res Judicata*

¶ 60    The defendants offer *res judicata* as another basis to affirm the circuit court's decision

to dismiss the 2007 complaint. The plaintiffs assert this contention was forfeited when the defendants failed to raise this argument before the circuit court. Because we affirm the judgment of the circuit court and follow its reasoning, we do not examine the viability of the *res judicata* argument.

¶ 61                                    CONCLUSION

¶ 62       Under our *de novo* review and limited to the context of this medical negligence case, we conclude the circuit court correctly applied judicial estoppel to dismiss the plaintiffs' refiled complaint in 2007 that asserted a factual underpinning of the theory of liability that was at odds with the factual underpinning of the liability theory the plaintiffs asserted in their original complaint, which ended in substantial settlements. Of course, if the application of judicial estoppel was subject to review under an abuse of discretion standard, our decision would be the same. We affirm.

¶ 63       Affirmed.

¶ 64       PRESIDING JUSTICE R. GORDON, dissenting:

¶ 65       I must respectfully dissent for several reasons. First, since the two complaints are essentially the same with respect to this defendant, I cannot find judicial estoppel.

¶ 66       The majority does not discuss the allegations in the complaints against this defendant. Dr. Lipkis is a defendant in the first complaint, which alleges that his wrongful conduct occurred between August 12 and August 18, 1999. The second complaint against Dr. Lipkis makes essentially the same allegations, namely, that he failed to diagnose plaintiff's condition during this same time period. As a matter of fact, the two complaints are essentially the same as to Dr. Lipkis.

¶ 67       The Background section of the majority opinion offers facts, but without a source for those facts. Since the first suit never reached a trial, no fact finder ever found what the facts are.

¶ 68       Second, the majority sets out the five requirements for judicial estoppel (*supra* ¶ 20), but does not discuss all five. When a doctrine has five requirements, we can reverse if one is missing but, to affirm, we need to analyze all five. The majority finds that *de novo* review applies (*supra* ¶¶ 22-23), but then affirms without reviewing *de novo* all five.

¶ 69       Third, the fifth requirement is not satisfied. As the majority observes, the fifth requirement is that the party succeeded in the first proceeding and received some benefit from it (*supra* ¶ 20). This is a two-part requirement that requires both: success in a judicial proceeding, as well as some benefit. However, other than *dicta* from two decades-old federal cases, the majority offers no case law to support its assumption that the fact of a settlement between private parties, by itself, qualifies as success in a judicial proceeding (*supra* ¶¶ 54, 57). For example, in *Bidani*, which the majority discusses extensively (*supra* ¶¶ 53-55), there was more than a simple settlement. The trial court entered both a judgment of dissolution of marriage, as well as an agreed order. *Bidani*, 285 Ill. App. 3d at 549.

¶ 70     While judicial estoppel serves to prevent a party from " '[h]oodwinking a [ ] court,' " there is no evidence that a court was hoodwinked here. *Bidani*, 285 Ill. App. 3d at 553 (quoting *Kale*, 985 F.2d at 361-62) (this is the first part of the quote provided by the majority *supra* ¶ 54). The best argument that can be made along these lines is that plaintiff somehow hoodwinked the well-represented hospitals and doctors into settling. However, where the trial court has not issued any judgment, I fail to see how a court was hoodwinked. *Cf. Goodman v. Hanson*, 408 Ill. App. 3d 285, 300 (2011) ("dismissal does not operate as a final judgment on the merits for purposes of *res judicata*, because 'an agreed order is not a judicial determination of parties' rights' " (quoting *Kandalepas v. Economou*, 269 Ill. App. 3d 245, 252 (1994)); *Currie v. Wisconsin Central, Ltd.*, 2011 IL App (1st) 103095, ¶ 29.

¶ 71     Fourth, although the majority, in essence, gives the settlement agreements preclusive effect, the majority fails to discuss any statements actually made in the agreements, because there are none that are relevant here. The settlement agreements do not indicate that they are based on representations made by the agents of any party. They do not contain any admissions or factual or legal findings. *Moy v. Ng*, 371 Ill. App. 3d 957, 963 (2007) (even agreed orders do not create judicial estoppel where they contain no admissions or findings of law or fact). These agreements are completely consistent with plaintiff's current position.

¶ 72     Fifth, the agreements do not support the majority's bald assertion that one prior expert's opinion in a multi-expert case *must have* caused these settlements. Parties settle for many reasons other than the opinion of a single expert in a multi-expert case: to avoid adverse publicity; to curtail litigation that can have such mounting costs that a win can seem like a loss; to gain a certain and fixed cost; or because of lost medical records, such as those lost by the defendants in this case. However, the majority baldly asserts that "we have no doubt" that the opinion of one prior expert caused the settlement (*supra* ¶ 57).

¶ 73     The majority also cites *Bidani* for the proposition that there does not have to be "an evidentiary link" between the statement and its benefit (*supra* ¶ 53). *Bidani* does not say that, and it does not stand for that. In fact, it stands for just the opposite. In *Bidani*, a husband in a divorce proceeding swore under oath during a court proceeding that he did not have an interest in certain companies. *Bidani*, 285 Ill. App. 3d at 548. The divorce judge then entered an agreed order and a final dissolution of marriage which did not include the husband's interest in those companies. *Bidani*, 285 Ill. App. 3d at 553. Then, in a second and unrelated action, the husband filed suit, now claiming ownership and profit interests in those same companies. *Bidani*, 285 Ill. App. 3d at 553. The trial court in the second suit entered summary judgment based on the judicial estoppel created by the husband's own sworn statements in the first action. *Bidani*, 285 Ill. App. 3d at 547. The appellate court held that, even though the divorce judge had not made a formal "judicial decision" that the husband lacked an interest in the companies, the appellate court could nonetheless find a direct link between the husband's sworn statement claiming no interest and the divorce judge's decision not to include that interest in the final judgment of dissolution. *Bidani*, 285 Ill. App. 3d at 553. Because the appellate court found that the judgment was the "result" of the statement, the appellate court affirmed the use of judicial estoppel. *Bidani*, 285 Ill. App. 3d at 553. By contrast, in the case at bar, it is unlikely that the hospital settled solely due to the anticipated testimony of one expert in a multi-expert case, particularly when the hospital had ready–not

-15-

one, not two, but–five dueling experts of its own. As stated above, it is far more likely that the hospital settled: to avoid adverse publicity; to curtail litigation; to gain a certain and fixed cost; or because of the medical records apparently lost by the settling defendants.

¶ 74    Sixth, the majority overlooks the fact that a complaint may be amended at any time and often is. As discovery progresses, and new evidence emerges, and parties are dismissed, the complaint is often amended to conform to the evidence. The irony here is that, if plaintiff had simply filed an amended complaint in the same suit rather than dismissing and refiling, there would have been no judicial estoppel argument, and we would have reviewed the issue in the context of whether the trial court had erred in allowing or denying the filing of the amended complaint. In the case at bar, the trial court's order dismissing the other defendants specifically "ordered that this matter will continue as to EVAN LIPKIS, M.D. and EVAN L. LIPKIS, M.D., S.C." Since this defendant was named in the first suit and the theory of liability has never changed as to that defendant, our case is different from those cases in which a party brings suit against one defendant, reaches a settlement, and then files a complaint with whole new allegations against a whole new party. This complaint has essentially the same allegations against the same party.

¶ 75    Seventh, the majority states that it could not find a single case applying judicial estoppel in a medical negligence case, and it concludes that this is a reason "not to follow the strict requirements for the application of judicial estoppel doctrine advanced by the cases" (*supra* ¶ 29). I must respectfully differ. If none of our colleagues have seen fit to use this doctrine as a bar in a medical negligence case, then this is a reason for us to hesitate to use it as a bar and, at the very least, to apply its requirements strictly–not loosely, as the majority holds.

¶ 76    Eighth, this is a failure-to-diagnose case. Plaintiffs' first expert found that all the defendants failed to diagnose. After the other defendants settled out, plaintiff retained a new expert who found the failure was primarily the failure of the remaining defendant. We can take judicial notice of the fact that, in medical negligence cases, after some defendants have settled out, plaintiffs often retain new experts. If we find judicial estoppel in this context, we will change the way medical negligence law is practiced. That is why neither the majority nor defendant can find a case that supports their use of judicial estoppel in this context. *Bidani*, 285 Ill. App. 3d at 550 (even when all five factors of the judicial estoppel doctrine are satisfied, a court should apply the doctrine "cautiously" and "only when not to do so would result in an injustice").

¶ 77    For these reasons, I must respectfully dissent.